IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PEDDU PATTAISO,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>RIM ALAHMAD, TARIK ALAHMAD, MANNATULLAH ZIADEH, NURA ZIADEH, RASHID ZIADEH, and DOES # 1-10,<br><br>　　　　　Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT**<br>**(Jury Trial Demanded)**<br>**(Electronically Filed)** |

Plaintiff Peddu Pattaiso, as and for her Complaint against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1.　"It ought to concern every person, because it's a debasement of our common humanity.  It ought to concern every community, because it tears at the social fabric.  It ought to concern every business, because it distorts markets.  It ought to concern every nation, because it endangers public health and fuels violence and organized crime.  I'm talking about the injustice, the outrage, of human trafficking, which must be called by its true name—modern slavery." President Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012).

2.　Plaintiff Peddu Pattaiso is a victim of human trafficking.  Preying on Plaintiff's dependence, trust, and vulnerability, Defendants lured Plaintiff from a

small village in Indonesia to the United States under false promises of a simple housekeeping job, humane working conditions, and fair pay.  Plaintiff came to this country with only one hope—to make enough money to support her four young children in Indonesia.  But immediately upon her arrival, and for the next thirteen years, she was put to work and subjected to long, grueling workdays for little or no compensation under inhumane working conditions.   To exploit Plaintiff, Defendants capitalized on her immigration status, lack of education, inability to communicate with the outside world, and unfamiliarity with the United States and its laws.  Plaintiff brings this action seeking just compensation for the damages that she has suffered at the hands of Defendants.

## **PARTIES**

3.     Plaintiff Peddu Pattaiso is a citizen of Indonesia.   She currently resides in Southern California.

4.     Upon information and belief, Defendants Tarik Alahmad and Rim Alahmad ("Ms. Alahmad"; together with Tarik Alahmad, the "Alahmads") are a married couple residing in Southern California.

5.     Upon information and belief, Defendants Rashid Ziadeh and Nura Ziadeh ("Ms. Ziadeh"; together with Rashid Ziadeh, the "Ziadehs") are a married couple residing in or near Harrisburg, Pennsylvania.

6.     Upon information and belief, Defendant Mannatullah Ziadeh is the

daughter of the Ziadehs and resides in or near Harrisburg, Pennsylvania.

7.     The Ziadehs and Mannatullah Ziadeh are the three named defendants in a criminal action in this Court, captioned <u>United States v. Ziadeh</u>, No. 1:12-cr-00043-WWC (M.D. Penn.) (Caldwell, J.).

8.     Defendants Does # 1-2 are natural persons whose identities are not yet known but who, upon information and belief, are a married couple residing in or near Chicago, Illinois.

9.     Defendants Does # 3-4 are natural persons whose identities are not yet known but who, upon information and belief, are a married couple residing in or near Chicago, Illinois.

10.     Defendants Does # 5-10 are natural persons whose identities and residences are not yet known but who are believed to have participated in the enterprise and scheme described herein.

## JURISDICTION AND VENUE

11.     The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise in part under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), <u>id.</u> §§ 1581-1597, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219a.  The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

12.     Venue in this District is proper under 18 U.S.C. § 1965(a)-(b) and 28 U.S.C. § 1391(b)(2) because, among other things, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, Defendants transacted business in this District, and the ends of justice require that all Defendants be summoned before this Court.

## FACTUAL ALLEGATIONS

### Defendants' Enterprise

13.     During the time period relevant to this Complaint, Defendants shared a common purpose of soliciting, facilitating, and/or obtaining inexpensive household labor from other countries, primarily Indonesia.  In furtherance of this common purpose, Defendants willfully and knowingly recruited, transported, harbored, and exploited women for purposes of forced labor, callously preying upon their vulnerabilities.

14.     Plaintiff was not the only victim.   Upon information and belief, Defendants lured more than one hundred women into the United States over the years.  Upon information and belief, most of the women caught up in Defendants' scheme were brought to this country through the use of A-3 Non-Immigrant Visas secured under pretenses known to be false to Defendants.  An essential part of Defendants' shared scheme was to avoid detection by immigration and other law enforcement authorities.  To keep their scheme secret, Defendants took advantage

of the dependence, trust, and vulnerability of their victims, including Plaintiff.

### Plaintiff's "Recruitment"

15.    Plaintiff was born in Indonesia in or about 1970, in the village of Dusun Salumati, Desa Takandeang.  Because she never attended school or received an education, Plaintiff cannot read or write in Indonesian or English.

16.    After twenty-three years of marriage, Plaintiff and her husband divorced.  As a single mother of four young children, Plaintiff made every attempt to find employment in Indonesia, but had no success.  In Indonesia, it is often difficult for a woman to support herself, and Plaintiff had no formal education or experience working outside the home.

17.    In the early 2000's, a woman from Jakarta named Fatma[1] visited Plaintiff's village to "recruit" people to work overseas.  Upon information and belief, Fatma was acting as Defendants' agent at all relevant times.  Fatma told Plaintiff that she would have to pay an "application fee" of Rp. 2,500,000 (approximately $250) to be considered for overseas work.  Upon information and belief, this so-called "fee" was designed to, and did, make Plaintiff feel indebted to Fatma and Fatma's principals—namely, Defendants.  With no other opportunities and in desperate need of employment to care for her four young children, Plaintiff borrowed from a relative and paid Fatma, who then transported Plaintiff to Jakarta.

---

[1]  Some of the names set forth in this Complaint are spelled phonetically.

18.    In Jakarta, Plaintiff was directed to work for a woman named Ipah while she waited for work overseas.  Upon information and belief, Ipah is a close relative of the Ziadehs and was acting as Defendants' agent at all relevant times.  Plaintiff worked as a housekeeper in Ipah's household for ten months and, despite being on call all hours of the day without breaks or time off, seven days per week, Plaintiff never received any compensation for her work in Ipah's household.  For this reason, Plaintiff could not send any money home to support her four young children.   In fact, Plaintiff was required to, and did, pay Ipah Rp. 900,000 (approximately $90) for what Plaintiff was told was the "fee" to process her paperwork to work overseas.  Upon information and belief, this "fee" was designed to, and did, make Plaintiff feel indebted to Ipah and Ipah's principals—namely, Defendants.   Several other women were in the same situation, living in Ipah's household hoping to secure work overseas.

19.    Ipah completed all the paperwork required for Plaintiff to work in the United States and took Plaintiff to the U.S. Embassy in Jakarta.  Ipah stayed with Plaintiff at all times during her interview with U.S. Embassy authorities and, beforehand, told Plaintiff exactly what to say.  During the interview, Plaintiff was presented with a document to sign.   Although Plaintiff could not read the document, and Ipah knew Plaintiff could not read the document, Plaintiff signed at Ipah's direction.  Plaintiff never received a copy of the document.

20.    Upon information and belief, Ipah directly or indirectly provided false employment information to U.S. Embassy authorities in order to secure an A-3 Non-Immigrant Visa on Plaintiff's behalf.  An A-3 Non-Immigrant Visa permits a citizen of a foreign country to temporarily reside in the United States if he or she is a personal employee of a foreign government official, such as a domestic worker. Upon information and belief, neither Ipah nor Defendants ever intended Plaintiff to provide labor or services to a foreign government official and Plaintiff never, in fact, provided labor or services to a foreign governmental official.   Accordingly, Plaintiff's subsequent residence in the United States did not comply with the terms of her visa and, as a result, was not lawful.   Upon information and belief, Defendants all knew or should have known of Plaintiff's immigration status and, in fact, deliberately engineered this state of affairs with a common purpose of soliciting, facilitating, and/or obtaining Plaintiff's labor and services at far below fair market value.

## Plaintiff's Transportation to the United States

21.    Plaintiff received an A-3 Non-Immigrant Visa on or about December 20, 2001.  Shortly thereafter, in or about February 2002, Plaintiff traveled to the United States with other women who had been similarly "recruited" for purposes of providing forced labor in the United States.

22.    When Plaintiff arrived in the United States at an airport in or near

Washington, D.C., she was met by the Ziadehs, who then transported Plaintiff to their home in or near Harrisburg, Pennsylvania.  Ms. Ziadeh confiscated Plaintiff's passport.  Plaintiff immediately realized that, without her passport, she was not free to leave.  Upon information and belief, Ms. Ziadeh retained Plaintiff's passport on Defendants' collective behalf with the intent to maintain and restrict Plaintiff's labor and services.  Defendants intended Plaintiff to believe that if she did not perform labor or services as a domestic servant and child-caretaker, she would suffer physical restraint, serious harm, or negative legal consequences, including deportation.  To further manipulate and control Plaintiff, Defendants exploited Plaintiff's lack of knowledge of English and the United States, isolation from friends and family, and fear of not being able to pay off the debts she incurred from the onerous recruitment "fees" she was told were necessary to secure work in the United States.

### Plaintiff's Forced Labor

23.    For the next several years following her arrival in the United States, Plaintiff worked around-the-clock as a domestic servant and child-caretaker in the Ziadehs' household in or near Harrisburg, Pennsylvania.  Despite being on call all hours of the day without breaks or time off, seven days a week, the Ziadehs only paid Plaintiff $5 per day ($150 per month), substantially below the federal and state minimum wage and overtime pay requirements.  The Ziadehs also improperly

withheld at least $1,400 in wages under the false pretense that the funds were to be used to purchase Plaintiff's return ticket to Indonesia.  As a result of all of the foregoing, Plaintiff was left with little or no money to send back to her four young children in Indonesia.

24.     Around this time, Ms. Ziadeh began operating as an unauthorized trader and broker of Plaintiff's body and services, selling Plaintiff and her labor and services to a hotel for a period of seven months, to a chocolate factory for a period of seven months, to a chicken packaging business for a period of one week, and to a cereal company for a period of one week.  Upon information and belief, Ms. Ziadeh received a financial benefit for selling Plaintiff and her labor and services to these companies.  Meanwhile, Plaintiff continued to work as a domestic servant and child-caretaker in the Ziadehs' household during evenings and on weekends.  Nonetheless, Plaintiff did not receive any compensation from the Ziadehs during this time period.

25.     Beginning in or about the fall of 2005 and continuing for a period of approximately seven months, Plaintiff worked around-the-clock as a domestic servant and child-caretaker for Defendant Mannatullah Ziadeh, the Ziadehs' daughter, who also resided in or near Harrisburg, Pennsylvania.  Despite Plaintiff being on call all hours of the day without breaks or time off, seven days per week, Defendant Mannutallah Ziadeh did not provide Plaintiff with any compensation

during this period.

26.     In or about mid-2006, Ms. Ziadeh sold Plaintiff and her services to Does # 1-2, a married couple living in Chicago, Illinois, for $7,000.   Plaintiff received no part of the $7,000 sum and never agreed to having her labor and services sold by Ms. Ziadeh.   Instead, Ms. Ziadeh operated as an unauthorized broker and trader of Plaintiff's body and services, effectively selling Plaintiff to Does # 1-2.   Upon information and belief, Does #1-2 knew that Ms. Ziadeh had no right or authority to sell Plaintiff or her services, but intentionally disregarded the unauthorized and illegal circumstances of the transaction in order to secure household labor at a cost far below fair market value.

27.     Upon completion of the transaction, the Ziadehs put Plaintiff on a plane to Chicago, where she was met immediately by Does # 1-2.   Does # 1-2 then transported Plaintiff to their home in or near Chicago, and kept Plaintiff in the confines of their household.   For the next two years and four months, Plaintiff worked around-the-clock as a domestic servant and child-caretaker in Does # 1-2's household.   Plaintiff was on call all hours of the day without breaks or time off, seven days per week.   Despite these grueling hours, Plaintiff was paid only $800 per month the first year, $900 per month the second year, and $1,000 per month for the final four months, all substantially below the federal and state minimum wage and overtime pay requirements.

28.    In or about the fall of 2008, Does # 1-2 returned Plaintiff to Pennsylvania, where Plaintiff again worked as a domestic servant and child-caretaker for Defendant Mannatullah Ziadeh.  For a period of three or four months, despite Plaintiff working all hours of the day without breaks or time off, seven days per week, Defendant Mannutallah Ziadeh did not provide Plaintiff with any compensation during this period.

29.    While Plaintiff was working in Chicago, she entrusted eight suitcases containing clothing and other personal belongings to the care and custody of Ms. Ziadeh.  Upon her return from Chicago, Plaintiff requested the return of her suitcases, but Ms. Ziadeh refused to return the suitcases and instead converted them to her own use, falsely claiming that the suitcases had been destroyed in a fire.

30.    In or about early 2009, Ms. Ziadeh sold Plaintiff and her services to Does # 3-4, a married couple who then lived in Arizona, for $7,000.  Plaintiff received no part of the $7,000 sum and did not agree to having her labor and services sold by Ms. Ziadeh.  Instead, Ms. Ziadeh operated as an unauthorized broker and trader of Plaintiff's body and services, effectively selling Plaintiff to Does # 3-4.  Upon information and belief, Does # 3-4 knew that Ms. Ziadeh had no right or authority to sell Plaintiff or her services, but intentionally disregarded the unauthorized and illegal circumstances of the transaction in order to secure

household labor at a cost far below fair market value.

31.     Upon completion of the transaction, the Ziadehs put Plaintiff on a plane to Arizona, where she was met immediately by Does # 3-4.  Does # 3-4 transported Plaintiff to their home in Arizona, where they kept Plaintiff in the confines of their household.  For the next seven months, the final four of which were spent in Chicago where the couple moved and transported Plaintiff, Plaintiff worked as a domestic servant and child-caretaker in Does # 3-4's household. Plaintiff was on call all hours of the day without breaks or time off, seven days per week.  Nonetheless, Plaintiff was paid only $1,000 per month, substantially below the federal and state minimum wage and overtime pay requirements.   While working for Does # 3-4 in Arizona and Chicago, Does # 3-4 subjected Plaintiff to physical and verbal abuse, yelling at Plaintiff, calling her names, and, on at least one occasion, pushing Plaintiff.

32.     In or about early 2010, Ms. Ziadeh sold Plaintiff and her services to the Alahmads, a married couple residing in or near San Diego, California, for $8,000.  Plaintiff received no part of the $8,000 sum and did not agree to having her services sold by Ms. Ziadeh.  Instead, Ms. Ziadeh operated as an unauthorized broker and trader of Plaintiff's body and services, effectively selling Plaintiff to the Alahmads.  Upon information and belief, the Alahmads knew that Ms. Ziadeh had no right or authority to sell Plaintiff or her services, but intentionally disregarded

the unauthorized and illegal circumstances of the transaction in order to secure household labor at a cost far below fair market value.

33.    Upon completion of the transaction, the Ziadehs put Plaintiff on a plane to San Diego, where she was met immediately by the Alahmads.  The Alahmads transported Plaintiff to their home in or near San Diego, where they kept Plaintiff in the confines of their home—specifically, in a small shed behind the house.  For the next one year and four months, Plaintiff worked as a domestic servant and child-caretaker in the Alahmads' household.  Plaintiff was on call all hours of the day without breaks or time off, seven days per week.  Nonetheless, Plaintiff was paid only $1,000 per month, substantially below the federal and state minimum wage and overtime pay requirements.  While working for the Alahmads, Ms. Alahmad subjected Plaintiff to verbal abuse and threatened Plaintiff with physical abuse.  In particular, Ms. Alahmad yelled at Plaintiff, called Plaintiff names, and tried to hit Plaintiff.

## Plaintiff's Escape

34.    In or about May 2011, feeling desperate and distraught about her situation and unable to tolerate the conditions under which she had been held, Plaintiff decided that she had to find a way to escape from the Alahmads' household and, more broadly, from Defendants' grip.  Plaintiff did not know where she would go, what she could do, or what the consequences would be, but despite

all of her fears of the unknown, Plaintiff's fear of being trapped in perpetual slavery by Defendants was greater.  On May 19, 2011, Plaintiff escaped from the Alahmads' household and contacted the authorities, who rescued Plaintiff and transported her to a safe shelter.

35.    Following her escape and rescue, Plaintiff cooperated with the U.S. Department of State, Bureau of Diplomatic Security, which, among other things, investigates human trafficking and the improper use of U.S. travel documentation. On or about June 6, 2011, Special Agent John Dolina authored a law enforcement certification in support of Plaintiff's application for lawful residence in the United States, indicating that Plaintiff "appears to have been recruited then transported to the United States by others; physically and mentally denied her travel documents; expected to perform domestic labor at locations and rates that are contradictory to the terms of her original contract; and placed in homes throughout the country to facilitate financial gain for a dominant brokering individual." Exhibit A.

36.    On or about September 19, 2013, Plaintiff secured a T-1 Non-Immigrant Visa, which recognizes her status as a victim of human trafficking and renders Plaintiff a lawful temporary resident of the United States.

## The Criminal Prosecution

37.    In or about 2006, the U.S. Department of State, Bureau of Diplomatic Security, began an investigation into potentially fraudulent visas being issued out

of the U.S. Embassy in Jakarta.   Upon information and belief, the investigation revealed a global human trafficking enterprise spearheaded by Ms. Ziadeh.

38.    On November 16, 2010, federal agents conducted a raid at the household of the Ziadehs in or near Harrisburg, Pennsylvania.   Upon information and belief, the authorities found at least four victims of human trafficking at the household, as well as several passports and luggage.   At least one of these four victims worked in the household of Defendant Mannatullah Ziadeh.

39.    On or about February 22, 2012, a federal grand jury indicted Defendants Mannatullah Ziadeh, Nura Ziadeh, and Rashid Ziadeh with multiple violations of 8 U.S.C. § 1324(a)(1)(A)—*i.e.*, recruiting an unauthorized alien for employment in the United States.   The criminal action is captioned <u>United States v. Ziadeh</u>, No. 1:12-cr-00043-WWC (M.D. Penn.) (Caldwell, J.).

40.    The Ziadehs have pleaded guilty to each of the indicted offenses. Upon information and belief, Defendant Mannatullah Ziadeh participated in a pretrial diversion program in lieu of prosecution.

<u>FIRST CLAIM FOR RELIEF</u>
**Violation of RICO: Participation in Racketeering Activity**
**18 U.S.C. §§ 1962(c), 1964**
(Against All Defendants)

41.    Plaintiff realleges and incorporates all the allegations set forth above.

42.    Each individual Defendant is a "person" capable of holding a legal or

beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

43.    Defendants are an association-in-fact constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).   The enterprise operates with a common purpose of soliciting, facilitating, and/or obtaining household labor through the use of interstate and foreign commerce.

44.    In furtherance of this common purpose, Defendants willfully and knowingly engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by committing acts indictable under 8 U.S.C. § 1324(a)(1)(A) and 18 U.S.C. §§ 1589, 1590.   Specifically, Defendants willfully and knowingly committed the following indictable acts: soliciting, transporting, and harboring illegal aliens; conspiring to solicit, transport, and harbor illegal aliens; aiding or abetting the solicitation, transportation, and harboring of illegal aliens; providing or obtaining a person's forced labor; benefitting from participation in a venture engaged in providing or obtaining a person's forced labor; and recruiting, transporting, harboring, providing, or obtaining a person for purposes of forced labor.

45.    Defendants directly or indirectly conducted or participated in the conduct of the enterprise's affairs through this pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

46.    As a direct and proximate result of Defendants' conduct, Plaintiff has

been injured in her business or property within the meaning of 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF

**Violation of RICO: Conspiracy to Participate in Racketeering Activity**
**18 U.S.C. §§ 1962(d), 1964**
(Against All Defendants)

47.     Plaintiff realleges and incorporates all the allegations set forth above.

48.     Each individual Defendant is a "person" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

49.     Defendants are an association-in-fact constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).   The enterprise operates with a common purpose of soliciting, facilitating, and/or obtaining household labor through the use of interstate and foreign commerce.

50.     In furtherance of this common purpose, Defendants conspired to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(d).   An essential part of the shared scheme was to avoid detection by immigration and other law enforcement authorities.

51.     Defendants agreed among themselves to engage in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by committing acts indictable under 8 U.S.C. § 1324(a)(1)(A) and 18 U.S.C. §§ 1589, 1590.

Specifically, Defendants willfully and knowingly conspired to commit the following indictable acts: soliciting, transporting, and harboring illegal aliens; conspiring to solicit, transport, and harbor illegal aliens; aiding or abetting the solicitation, transportation, and harboring of illegal aliens; providing or obtaining a person's forced labor; benefitting from participation in a venture engaged in providing or obtaining a person's forced labor; and recruiting, transporting, and harboring a person for purposes of forced labor.

52.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in her business or property within the meaning of 18 U.S.C. § 1964(c).

### THIRD CLAIM FOR RELIEF
**Violation of the TVPRA: Forced Labor**
**18 U.S.C. §§ 1589(a), 1595**
(Against All Defendants)

53.     Plaintiff realleges and incorporates all the allegations set forth above.

54.     Defendants willfully and knowingly provided or obtained Plaintiff's labor and services by means of force or threats of force, physical restraint or threats of physical restraint, serious harm or threats of serious harm, abuse or threatened abuse of law or legal process, and/or a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform labor or services, she would suffer serious harm or physical restraint within the meaning of 18 U.S.C. § 1589(a).

55.   Plaintiff is a victim within the meaning of 18 U.S.C. § 1595(a).

56.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Violation of the TVPRA: Conspiracy to Engage in Forced Labor
### 18 U.S.C. §§ 1594(b), 1589(a), 1595
(Against All Defendants)

57.   Plaintiff realleges and incorporates all the allegations set forth above.

58.   Defendants conspired, and agreed among themselves, to provide or obtain Plaintiff's labor and services by means of force or threats of force, physical restraint or threats of physical restraint, serious harm or threats of serious harm, abuse or threatened abuse of law or legal process, and/or a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform labor or services, she would suffer serious harm or physical restraint within the meaning of 18 U.S.C. § 1589(a).

59.   Plaintiff is a victim within the meaning of 18 U.S.C. § 1595(a).

60.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### Violation of the TVPRA: Trafficking
### 18 U.S.C. §§ 1590(a), 1595
(Against All Defendants)

61.   Plaintiff realleges and incorporates all the allegations set forth above.

62.    Defendants willfully and knowingly recruited, harbored, transported, provided, or obtained Plaintiff for purposes of forced labor within the meaning of 18 U.S.C. § 1590(a).

63.    Plaintiff is a victim within the meaning of 18 U.S.C. § 1595(a).

64.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Violation of the TVPRA: Conspiracy to Engage in Trafficking
### 18 U.S.C. §§ 1594(b), 1590(a), 1595
(Against All Defendants)

65.    Plaintiff realleges and incorporates all the allegations set forth above.

66.    Defendants conspired, and agreed among themselves, to recruit, harbor, transport, provide, or obtain Plaintiff for purposes of forced labor within the meaning of 18 U.S.C. § 1590(a).

67.    Plaintiff is a victim within the meaning of 18 U.S.C. § 1595(a).

68.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### Violation of the TVPRA: Benefitting from Forced Labor and Trafficking
### 18 U.S.C. §§ 1589(b), 1595
(Against All Defendants)

69.    Plaintiff realleges and incorporates all the allegations set forth above.

70.    Defendants willfully and knowingly participated in a venture that

engaged in providing or obtaining Plaintiff's forced labor and/or trafficking Plaintiff for purposes of forced labor in violation of 18 U.S.C. §§ 1589(a), 1590(a).

71.    Defendants knew or should have known that the venture engaged in such acts within the meaning of 18 U.S.C. §§ 1589(b), 1595(a).

72.    Defendants financially benefitted by participating in the venture within the meaning of 18 U.S.C. §§ 1589(b), 1595(a).

73.    Plaintiff is a victim within the meaning of 18 U.S.C. § 1595(a).

74.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
**Violation of the TVPRA: Conduct Concerning Immigration Documents**
**18 U.S.C. §§ 1595, 1597**
(Against Defendant Nura Ziadeh)

75.    Plaintiff realleges and incorporates all the allegations set forth above.

76.    Defendant Nura Ziadeh willfully and knowingly concealed, removed, confiscated, or possessed Plaintiff's immigration documents in the course of violating and with the intent to violate 8 U.S.C. § 1324(a)(1)(A) and/or in order to unlawfully maintain, prevent, or restrict Plaintiff's labor or services in violation of 18 U.S.C. § 1597.

77.    Plaintiff is a victim within the meaning of 18 U.S.C. § 1595(a).

78.    As a direct and proximate result of Defendant Nura Ziadeh's conduct,

Plaintiff has suffered damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

**Violation of the TVPRA: Conspiracy Concerning Immigration Documents**
**18 U.S.C. §§ 1594(b), 1595, 1597**
(Against All Defendants)

79.     Plaintiff realleges and incorporates all the allegations set forth above.

80.     Defendants conspired, and agreed among themselves, to conceal, remove, confiscate, or possess Plaintiff's immigration documents in the course of violating and with the intent to violate 8 U.S.C. § 1324(a)(1)(A) and/or in order to unlawfully maintain, prevent, or restrict Plaintiff's labor or services in violation of 18 U.S.C. § 1597.

81.     Plaintiff is a victim within the meaning of 18 U.S.C. § 1595(a).

82.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF

**Violation of the FLSA: Failure to Pay Minimum Wage and Overtime Pay**
**29 U.S.C. §§ 206, 207, 216(b)**
(Against All Defendants)

83.     Plaintiff realleges and incorporates all the allegations set forth above.

84.     Plaintiff and Defendants were in an employment relationship within the meaning contemplated by 29 U.S.C. § 203(d)-(e).

85.     Defendants willfully and knowingly failed to pay Plaintiff the statutory minimum wage and overtime pay for her labor and services in violation

of 29 U.S.C. §§ 206, 207.

86.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF

**Violation of the Pennsylvania Minimum Wage Act: Failure to Pay Minimum Wage and Overtime Pay**
**43 Pa. Cons. Stat. §§ 333.104, 333.113**
(Against Defendants Mannatullah Ziadeh, Nura Ziadeh, and Rashid Ziadeh)

87.     Plaintiff realleges and incorporates all the allegations set forth above.

88.     Plaintiff and Defendants Mannatullah Ziadeh, Nura Ziadeh, and Rashid Ziadeh were in an employment relationship within the meaning contemplated by 43 Pa. Cons. Stat. § 333.103(f)-(g).

89.     Defendants Mannatullah Ziadeh, Nura Ziadeh, and Rashid Ziadeh willfully and knowingly failed to pay Plaintiff the statutory minimum wage and overtime pay for her labor and services in violation of 43 Pa. Cons. Stat. § 333.104.

90.     As a direct and proximate result of Defendants Mannatullah Ziadeh, Nura Ziadeh, and Rashid Ziadeh's conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF

**Violation of the California Labor Code: Failure to Pay Minimum Wage and Overtime Pay**
**Cal. Labor Code §§ 1194, 1197, 1198**
(Against Defendants Rim Alahmad and Tarik Alahmad)

91.     Plaintiff realleges and incorporates all the allegations set forth above.

92.     Plaintiff and Defendants Rim Alahmad and Tarik Alahmad were in an employment relationship.

93.     Defendants Rim Alahmad and Tarik Alahmad willfully and knowingly failed to pay Plaintiff the statutory minimum wage and overtime pay for her labor and services in violation of Cal. Labor Code §§ 1197-1198.

94.     As a direct and proximate result, Plaintiff has suffered damages in an amount to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF

**Quantum Meruit**
(Against All Defendants)

95.     Plaintiff realleges and incorporates all the allegations set forth above.

96.     Plaintiff has conferred significant benefits upon Defendants by performing labor and services on their behalf.

97.     Defendants have failed to fairly compensate Plaintiff for such labor and services.

98.     As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

## FOURTEENTH CLAIM FOR RELIEF
### Unjust Enrichment
(Against All Defendants)

99.   Plaintiff realleges and incorporates all the allegations set forth above.

100.   Plaintiff provided labor and services to Defendants in good faith and with the expectation that she would be fairly compensated for such labor and services.

101.   Defendants accepted those services but failed to compensate Plaintiff for the fair market value of her services.

102.   Defendants have been unjustly enriched at Plaintiff's expense.

103.   As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

## FIFTEENTH CLAIM FOR RELIEF
### Unjust Enrichment
(Against Defendant Nura Ziadeh)

104.   Plaintiff realleges and incorporates all the allegations set forth above.

105.   Defendant Nura Ziadeh sold Plaintiff's labor and services to other persons in the absence of any legal, contractual, or other entitlement to do so.

106.   Defendant Nura Ziadeh received a financial benefit for selling Plaintiff's labor and services to other persons but failed to fairly compensate Plaintiff for such labor and services.

107.   Defendant Nura Ziadeh has been unjustly enriched at Plaintiff's

expense.  It would be inequitable and unconscionable for Defendant Nura Ziadeh to retain the fruits of her wrongdoing.

108.   As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

## SIXTEENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
(Against All Defendants)

109.   Plaintiff realleges and incorporates all the allegations set forth above.

110.   Defendants intentionally used their position of power and control over Plaintiff to engage in a pattern of extreme and outrageous abuse against her.

111.   Defendants exploited Plaintiff's dependence, trust, and vulnerability.

112.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe emotional distress and is entitled to damages in an amount to be proven at trial.

## SEVENTEENTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
(Against All Defendants)

113.   Plaintiff realleges and incorporates all the allegations set forth above.

114.   Defendants owed Plaintiff a duty of care.   Unfamiliar with U.S. customs and institutions and lacking a formal education or means of communicating with the outside world, Plaintiff relied on Defendants for food, shelter, and access to medical care.  In addition, because Plaintiff arrived in the

United States on an A-3 Non-Immigrant Visa, her immigration status was entirely dependent upon her employers.

115.   Defendants breached the duty of care they owed Plaintiff by engaging in the acts and omissions described above.

116.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe emotional distress and is entitled to damages in an amount to be proven at trial.

### EIGHTEENTH CLAIM FOR RELIEF

**Breach of Contract**
(Against All Defendants)

117.   Plaintiff realleges and incorporates all the allegations set forth above.

118.   Plaintiff and Defendants agreed to a contract which provided that Defendants would be Plaintiff's employer and fairly compensate Plaintiff for her labor and services.

119.   Plaintiff fully performed under the contract by providing the specified labor and services as a domestic servant and child-caretaker.

120.   Defendants breached the contract by failing to pay Plaintiff the amount specified in the contract.

121.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be proven at trial.

## NINETEENTH CLAIM FOR RELIEF

### Conversion

(Against Defendant Nura Ziadeh)

122.   Plaintiff realleges and incorporates all the allegations set forth above.

123.   Plaintiff owned eight suitcases containing clothing and other personal belongings.  While Plaintiff was in Chicago, Illinois, she entrusted her suitcases to the care and custody of Defendant Nura Ziadeh.

124.   Upon her return from Chicago, Plaintiff requested the return of her suitcases from Defendant Nura Ziadeh.

125.   Defendant Nura Ziadeh willfully and knowingly refused to return the suitcases and instead converted them to her own use, falsely claiming that the suitcases had been destroyed in a fire.

126.   As a direct and proximate result of Defendant Nura Ziadeh's conduct, Plaintiff has suffered damages in an amount to be proven at trial.

## REQUESTED RELIEF

WHEREFORE, Plaintiff demands that a judgment be entered in her favor and against Defendants as follows:

a.   Awarding compensatory, incidental, and consequential damages in an amount to be determined at trial;

b.   Awarding statutory penalties, liquidated damages, treble damages, and punitive damages in an amount to be determined at trial;

c.  Ordering disgorgement and restitution of all unlawfully obtained proceeds in an amount to be determined at trial;

d.  Awarding pre- and post-judgment interest;

e.  Awarding reasonable attorneys' fees and costs; and

f.  Awarding such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiff demands a trial by jury.


Dated:  January 10, 2013                Respectfully submitted,

                                        DUANE MORRIS LLP


                                        By:   /s/  Lawrence H. Pockers
                                            Lawrence H. Pockers
                                               lhpockers@duanemorris.com
                                               Bar No. PA 84589

                                        30 S. 17th Street
                                        Philadelphia, Pennsylvania  19103-4196
                                        Telephone:  +1-215-979-1153
                                        Facsimile:   +1-215-689-3761

                                        *Attorneys for Plaintiff Peddu Pattaiso*

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:   /s/ Devin Slack
     Mark Wine*
       mwine@orrick.com
       Bar No. CA 189897
     Devin Slack*
       dslack@orrick.com
       Bar No. NY 4628293
     Hsiwen Lo*
       hlo@orrick.com
       Bar No. CA 286649

51 W. 52nd Street
New York, New York  10019-6142
Telephone:  +1-212-506-5000
Facsimile:  +1-212-506-5151

*Attorneys for Plaintiff Peddu Pattaiso*

* Applications for regular or *pro hac vice* admission to be filed.

## ELECTRONIC FILER'S REPRESENTATION

I represent that concurrence in the filing of this document has been obtained

from its signatories.

Dated:  January 10, 2013

/s/  Lawrence H. Pockers

Lawrence H. Pockers
   lhpockers@duanemorris.com
   Bar No. PA 84589

30 S. 17th Street
Philadelphia, Pennsylvania  19103-4196
Telephone:  +1-215-979-1153
Facsimile:   +1-215-689-3761